Frank A. Martínez et al., Petitioners, *v.* Insular Board of Elections, etc., Respondent.

No. 275. Argued April 18, 1932.—Decided April 29, 1932.

*Jorge V. Domínguez, Miguel Guerra-Mondragón, M. A. Martínez Dávila,* and *Manuel A. García Méndez* for petitioners. *Bolívar Pagán* for respondent.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

Petitioners allege that they have been named by the central directing organization of the Puerto Rican Liberal Party as observer and substitute observer respectively of such party with voice and vote on the Insular Board of Elections; that the said party is a political party duly registered in the office of the Executive Secretary of Puerto Rico, with general and local tickets throughout the Island, including a candidate for Resident Commissioner in Washington, and with 42,204 voters, more than fifteen per cent of the total number of qualified voters who voted in the last general election for a resident commissioner; that the Puerto Rican Liberal Party, upon call of its governing committee, held a general assembly or convention which ratified the ticket registered by petition in the office of the Executive Secretary and adopted a party platform and regulations; that the defendant, Chas. H. Terry, General Supervisor of Elections, and the other defendants, Bolívar Pagán, representing the Socialist Party and Leopoldo Figueroa, representing the Republican Union Party, form the Insular Board of Elections as actually constituted; and, upon information and belief, that the Socialist Party and the Republican Union have come to an agreement whereby they are in fact merged into one party with double representation on the said Insular Board of Elections.

The prayer is for an adjudication that section 1 of the Election and Registration Law, as amended in 1924 (Session Laws, p. 2), is void, unconstitutional, and without force and effect as to certain requirements of the proviso thereto attached, and for a peremptory writ of mandamus to compel the recognition of petitioners by the Insular Board of Elections as observer and substitute observer respectively with voice and vote as representatives of the Puerto Rican Liberal Party on the said board.

The section in question reads in part as follows:

"A permanent Board of Elections is hereby established, to be composed of a General Supervisor of Elections, as chairman who shall be

appointed by the Governor with the advice and consent of the Senate of Porto Rico, and two persons representing the two principal political parties of the Island as hereinafter defined, and a substitute for each such member, who shall be appointed by the Governor on recommendation of the central directing organizations of the said parties; *Provided, however,* That the central directing organization of any political party whose candidate for Commissioner to the United States received twenty per cent or more of the total vote cast for candidates for that office at the preceding election shall have the right to appoint a representative and one substitute to be designated as 'observer,' who shall enjoy all the rights and privileges of members of the said board and shall have voice but no vote in its deliberations and decisions."

The case of *Martínez* v. *Saldaña*, 38 P.R.R. 398, relied upon by petitioners, does not resolve the question now before us. Most of the other authorities cited by petitioners enunciate general principles of Constitutional Law and of statutory construction. None of them points definitely to the conclusion that a statute which creates an election board and confers bipartisan representation upon the two principal political parties is unconstitutional as an unreasonable restriction of the right of suffrage or otherwise, because it does not extend the privilege of representation to all political parties. The language of the proviso is perfectly plain. It leaves no room for doubt, nor for construction. The right to appoint an observer is conferred upon "the central directing organization of any political party whose candidate for Commissioner to the United States received twenty per cent or more of the total vote cast for candidates for that office at the preceding election," not upon the central directing organization of any political party organized by petition and convention with or without any given number of qualified voters who voted at the preceding election. The statement that such observer "shall have voice but no vote" in the deliberations and decisions of the board is equally unequivocal.

The statute is presumed to be constitutional. If unconstitutional, the burden is upon petitioners to establish that fact. The petition and authorities cited in support thereof

do not show that the proviso in question or the section as a whole amounts to a regulation of the exercise of the elective franchise, nor that such a regulation would be unconstitutional as an undue interference with the right of suffrage. Viewed from any other standpoint the enactment may or may not be unreasonable, absurd, arbitrary or unjust. It is not within the province or the power of this Court to modify or amend the law by judicial legislation in the guise of statutory construction. See 25 R.C.L. pp. 1018, 1019, 1022, 1024 and 1027 cited by petitioners. See also 9. R.C.L. 1013, 1014, section 33; 20 C.J. 92, section 73; Id. 91, section 70.

No member of this Court doubts the desirability of placing a representative of the Puerto Rican Liberal Party on the Board of Elections as an observer. This can not be done under the law as it stands. The question of amendment, either as a matter of fair play or as an additional guarantee of an honest and impartial election, is, to repeat, a question for the Legislature.

Full proof of the averment as to the existence of an understanding between the two principal parties which amounts to a merger would perhaps present a more serious question. Obviously the Legislature in the law as it stands failed to foresee, or to make any provision for such a possibility. We do not now see just how this Court could supply the omission. Nevertheless, if petitioners are prepared to prove the alleged pact, they will, upon request, be given an opportunity to do so and to show, if they can, that they are entitled to the writ on this ground. If no motion is made within three days, the petition will be denied.

ON MOTION FOR REHEARING

May 31, 1932

Mr. Justice Hutchison delivered the opinion of the Court.

Petitioners now move for a rehearing, for an opportunity to present a brief, and for an extension of time within which to offer evidence in support of the averment as to the existence of an electoral pact.

The first ground of the motion is that, at the close of the hearing on April 18, this Court granted only twenty-four hours for the filing of a memorandum of authorities and did not give the parties an opportunity to submit briefs. The case was originally set for April 21. Petitioners immediately appeared and asked that the hearing be advanced to April 18. It was so ordered. They should have been prepared to present their case at that time. They said nothing about a brief nor did they ask for more than twenty-four hours within which to file a memorandum. A brief would have been most welcome and all the time needed for its preparation would have been granted on request.

The second ground of the motion is that, due to the lapse of eighteen days after the hearing and before the decision, the Court could not remember the principal argument relied on by petitioners and therefore did not pass upon the main question. This contention is restated in more words as the third and fourth grounds of the motion.

Petitioners were represented at the hearing by three attorneys. One of these, the first to address the Court, advanced the theory now again set forth as the second, third, and fourth grounds of the motion for a rehearing. It is, in substance, that sections 1 and 13 of the Election Law do not and can not regulate the rights of political parties because these parties do no exist and are not recognized as legal entities distinguishable from the voters of which they consist; that the voters, as constituent parts of political parties, and the right of such voters to vote are the only possible subjects of regulation; and that if the law regulates the right of suffrage, not the rights of political parties organized by petition or convention or otherwise, a group of qualified voters who voted in the preceding election for a resident commissioner, upon uniting thereafter under a common name are, in contemplation of law, within the purpose and meaning of the statute and that this should be deemed a substantial compliance with the requirement concerning the vote cast in the

preceding election and should be deemed enough to confer upon such voters the right to representation on the Board of Elections.

The case was submitted and in due time discussed and subsequently the writer was selected for the drafting of a memorandum which was thereafter adopted as the opinion of the Court. Before the final assignment, which was made within the week preceding the date of the opinion, the Court had considered and discarded the theory of petitioners as above outlined. It had neither forgotten nor ignored the oral argument of counsel. Before a definite conclusion could be reached, however, counsel for petitioners were making inquiries about the case. This gave the impression that petitioners desired a prompt determination of the main issue rather than an exhaustive discussion of each and every point presented.

The only authorities cited by petitioners in their memorandum in support of the theory above outlined were *Barceló* v. *Saldaña*, 42 P.R.R. 219, and *Martínez* v. *Saldaña*, 38 P.R.R. 398. No others are mentioned in the motion for rehearing. The opinion in *Barceló* v. *Saldaña* contains an extract from *Davis* v. *Hambrick*, 58 S. W. 779, 780, and another from *Morrow* v. *Wipf*, 115 N. W. 1121, 1126, and 1127. What the court held in *Davis* v. *Hambrick* is correctly set forth in the syllabus, which reads thus:

"As the courts have no power to interfere with the judgment of the highest tribunal of a political party in a matter involving party government, the decision of the state central committee of the Republican party that certain persons constituted the Republican executive committee of a particular county, and that a certain one of their number is the chairman of the committee, is final and conclusive."

The extract from *Morrow* v. *Wipf*, is self-explanatory. It follows:

". . . . Political parties are not creatures of the law. They exist independently of statutes; and have inherent power to regulate their

own affairs *subject only to such legislative restrictions* as have been lawfully enacted. . . .

". . . . Political parties result from the voluntary association of electors. They do not exist by operation of law; and they possess plenary powers as to their own affairs *in the absence of legislative regulation.*" (Italics ours.)

Similar expressions and various definitions may be found in 49 C. J. 1074, 1075 and 1076, section 15, where it is said, among other things, that "In the absence of a statutory definition, resort is had to the generally accepted meaning of the term, . . ." and that "In the absence of legislative enactment, a political party is governed by its own usages and establishes its own rules."

We need not quibble about the meaning of words and phrases. The Election and Registration Law does not define the words "political party." By the terms of section 14, "principal parties" are "the two political parties whose candidates for Commissioner to the United States received the highest and next to the highest number of votes cast for candidates for that office at the preceding election; . . ." A "majority party" is "the political party whose candidate for Commissioner to the United States received the highest number of votes cast for a candidate for that office at the preceding election; . . . " An "organized party" is "a political party whose candidate for Commissioner to the United States received twenty per cent or more of the total vote cast for all candidates for that office at the preceding election; . . ." Here and in section 1 the Legislature is dealing with political parties as such, not directly with the individual voter. They are classified according to strength as shown by the results of the preceding election. The words "group of electors" or "association of voters" may be substituted wherever the words "political party" are employed. Mere juggling with words can not affect the result. Facts are stubborn things.

Section 1 provides for bipartisan representation on the Board of Elections. This representation is conferred upon

the two principal parties. Any political party "whose candidate for Commissioner to the United States received" a certain percentage "of the total vote cast for candidates for that office at the preceding election" is entitled to an observer. "A group of qualified voters who voted in the preceding election for a resident commissioner" and who have since united under a common name are not "in contemplation of law within the purpose and meaning of the statute," and such voting and subsequent organization can not "be deemed a substantial compliance" with the statutory requirement, because what the statute contemplates and requires is that such a group of voters must have had a common candidate for resident commissioner at the preceding election, not that a political party subsequently organized must be composed of electors who voted for or against the candidate of some other political party at the preceding election. The group of voters known as the Puerto Rican Liberal Party had not come into existence at the time of the latest general election and therefore, as such group, has never had a candidate for resident commissioner. We practically disposed of the question which petitioners now say was not decided by our previous opinion when we said therein that—

". . . . The language of the proviso is perfectly plain. It leaves no room for doubt, nor for construction. The right to appoint an observer is conferred upon 'the central directing organization of any political party whose candidate for Commissioner to the United States received twenty per cent or more of the total vote cast for candidates for that office at the preceding election,' not upon the central directing organization of any political party organized by petition and convention with or without any given number of qualified voters who voted at the preceding election."

The fifth ground of the motion is that this Court treated the case of *Martínez* v. *Saldaña, supra,* as inapplicable, although in that case it had held that regulation of the elective franchise must be reasonable and that a requirement of twenty per cent as a prerequisite to the right of a party

organized by petition to nominate candidates was unconstitutional. It is inconceivable, say counsel for petitioners, that one statutory provision should be unconstitutional as excluding the Historic Constitutional Party from participation in the elections, and that a like provision in the same law excluding the Puerto Rican Liberal Party from representation on the Board of Elections should be constitutional. We quite agree with counsel that in determining what percentage may be fixed by the Legislature as a minimum, the same yardstick should be used in both cases. Whether or not any distinction may be drawn between the right to nominate candidates either by petition or by convention and the right to representation on the Insular Board of Elections, is another question. No such distinction, however, was drawn in our previous opinion. Section 36 of the Election Law as amended in 1923 provides that ''Any political party which shall have cast more than twenty (20) per cent of the total vote of the Island for commissioner to Washington at the last general election, shall be entitled to nominate candidates by duly called conventions.'' That was the provision under consideration in the *Martínez* case, *supra*. The Historic Constitutional Party had cast more than ten per cent (of the total vote of the Island for commissioner to Washington) at the preceding general election. There was no question as to the constitutionality of the requirement concerning participation in the preceding general election as a condition precedent to the nomination of candidates by convention. What this Court held was that the twenty per cent feature of the requirement was unreasonable and therefore unconstitutional and that the Historic Constitutional Party, having polled more than ten per cent of the total vote cast at the preceding general election, was entitled to nominate candidates by convention. Returning now to the instant case, the Court did not say nor mean to imply in its previous opinion that the doctrine of the *Martínez* case, *supra*, was inapplicable to the twenty per cent aspect of the proviso attached to section 1. On the

contrary, it assumed without expressly holding that the twenty per cent feature of the proviso was unreasonable and therefore unconstitutional. In other words it assumed, without expressly holding, that if the Puerto Rican Liberal Party had nominated a candidate for Commissioner to the United States and if such candidate had received seventeen per cent, or even a smaller percentage of the total vote cast for candidates for that office at the election of 1928, petitioners would then have been entitled to a place on the Election Board as observer. The point is that even if the Puerto Rican Liberal Party had secured the signatures of more than twenty per cent of the voters who voted for a Commissioner to the United States at the preceding election, still it would not be entitled to representation on the Insular Board of Elections under the provisions of section 1. What the Court said in its pre-- vious opinion was that the case of *Martínez* v. *Saldaña* did not resolve the question then before it. There is nothing in the motion for rehearing to indicate that the Court was mistaken.

The sixth ground of the motion is that this Court failed to apply the rule of statutory construction that when a law is open to two interpretations, one contrary to a right recognized by the Organic Act and another in favor of such right, the latter should prevail. This is followed by the statement that the voter has an unquestionable constitutional right to representation on the Board of Elections as an incident to his right to a free exercise of the elective franchise in order to guarantee an honest and impartial election. The object and purpose of all statutory construction is to ascertain the meaning of the statute in question. When that meaning has been expressed in clear and unmistakable terms by the Legislature itself, there is no room and no excuse for construction. The Court said in its former opinion that the language of the proviso was perfectly plain and that it left no room for doubt nor for construction. Nevertheless, counsel for petitioners still assume (as they have done from the beginning

without attempting to show) that this is not true. As they have done from the beginning, they still assume without attempting to show that the voter has a constitutional right to representation on the Board of Elections. This may or may not be true. In the absence of any showing whatever in this regard, we are not prepared to assume with counsel that individual or party representation on the Board of Elections is the only possible means of securing a reasonably fair and impartial election.

As we have shown, two members of the Insular Board of Elections represent the two principal parties. Each of these two members on recommendation of his party is appointed by the Governor. The chairman is appointed by the Governor, by and with the advice and consent of the Senate. All three are subject to removal by the appointing power. By the terms of section 32 of the law, any elector whose registration has been canceled may appeal to the courts. Section 89 provides that the result of the canvass of an election may be reviewed by certiorari. A law approved May 4, 1931 (Session Laws, p. 448), prescribes the procedure for contesting "the election of officers other than members of the Legislature and the Resident Commissioner to the United States."

It may be conceded that the right to vote carries with it the right to have that vote counted in favor of the candidates for whom it was cast. It may be conceded that the machinery provided by law for conducting an election leaves much to be desired, that an ounce of prevention is better than a pound of cure, and that the presence of an observer representing every political party whose name is to appear upon the ballot sheets would be an effective means of securing a fair and impartial election. It does not follow that the failure to provide for such an observer is a material impairment of the right to vote. Can any member of the Insular Board of Elections obtain the cancellation of a name on the registration lists

or the elimination of a vote from the official returns except through collusion and with the connivance of some other member? Do the facts before this Court show that the two opposing parties already represented on the Board of Elections have any common interest in crippling a newly formed political party not so represented? Can this Court safely assume that the two members of the board appointed by the Governor on the recommendation of the two principal parties would cooperate in carrying out such a design? Can it assume that in such event the new organization would not find both voice and vote in the protest of the chairman? If any or all of the members should prove to be corrupt, would the Chief Executive refuse to act? Are the remedies by appeal, by certiorari, and by contest inadequate?

These are some of the questions involved in the broader question as to whether the Registration and Election Law as a whole places any unreasonable limitation upon the exercise of the elective franchise. None of them has been adequately discussed by counsel for petitioners. Most of them have not been mentioned.

The seventh ground of the motion is that this Court failed to decide and left in doubt the questions as to whether the regulation involved in sections 1 and 13 is unreasonable, absurd, arbitrary, unequal, and unjust. Counsel submit that, aside from any question of constitutionality, a decision of these questions is fundamentally necessary in order to determine the political rights of petitioners "who constitute a considerable group of opinion." This Court, they say, could have decided that, although the Legislature has the power to regulate, such regulation, viewed from any angle, can not be unreasonable or absurd or arbitrary or unequal or unjust. The only authorities cited by petitioners in their original memorandum in support of this contention were 25 R.C.L. 1018, 1019, 1022, 1024, 1027; and *State ex rel. McGrael* v. *Phelps,* 35 L.R.A. (N.S.) 353. No others are cited in the

motion for rehearing. Turning to 25 R.C.L. at the pages indicated, we read:

"256. *Unreasonableness.*—One of the established rules for the construction of statutes is that they should have a rational, sensible construction, if their meaning is at all doubtful. When the language of a statute fairly permits, a construction which will lead to an unreasonable result should be avoided . . . . The rule against giving an unreasonable operation to a statute is, of course, subject to the limitation that if the language employed in a statute necessarily forbids any other construction than one leading to an unreasonable result, it is the duty of the court to adopt and enforce that construction . . . .

"257. *Absurdity.*—While the legislature may pass absurd legislation if it is so inclined, before a court will adopt such a construction of a statute as will lead to an absurdity it will inquire whether there is not some other interpretation possible which will not lead to that result. If the language employed admits of two constructions, and according to one of them the enactment would be absurd if not mischievous, while according to the other it will be reasonable and wholesome, the construction which will lead to an absurd result should be avoided . . . . However, where the apparently absurd meaning is unquestionably the real one, the law must stand with such meaning or fall altogether. By an absurdity is meant that which is to be regarded as morally impossible, which is contrary to reason, or, in other words, which could not be attributed to men in their right senses. Even though a literal interpretation of a statute should not be followed where such interpretation would lead to an absurd consequence, the fact that the effect of the statute as applied to a particular case may be inequitable does not make it absurd so as to justify a departure from its plain meaning.

"258. *Hardship or Injustice.*—It is to be presumed that the legislature did not intend a law to work a hardship or injustice, and it is a reasonable and safe rule of construction to resolve any ambiguity or absurdity in a statute in favor of a just and equitable operation of the law. The terms employed by the legislature are not to receive an interpretation which conflicts with acknowledged principles of justice if another sense, consonant with those principles, can be given to them. It is a universal rule in the exposition of statutes that the intent of the law, if it can be clearly ascertained, shall prevail over the letter, and this is especially true where the precise words, if construed in their ordinary sense, would lead to

manifest injustice .... But where the language of the statute is clear and unambiguous and the intention plain, it is the duty of the court to expound the statute as it stands, even if the consequence is a hardship or injustice, especially where the hardship or injustice would be occasional and exceptional .... It was at one time urged that the courts might mitigate the rigor of harsh statutes by adopting a rule of equitable construction by which exceptions might be read into such statutes. But the proposition, however it may once have been held or considered, that the courts, upon what is termed an equitable construction or otherwise, may, against the plain language of a statute, and in opposition to the intent clearly expressed by the words, mitigate the 'violence of the letter' by introducing exceptions where the statute itself contains none, so as to relieve in cases of hardship or particular inconvenience, has been too long and too frequently rejected to be now the subject of serious argument or doubt. Such doctrine, if it ever existed, was long since exploded, and the rule now universally recognized and acted upon is that, whatever else may be done with the words of a statute, they may never, in the language of Lord Bacon, 'be taken to a repugnant intent.'

"  *      *      *      *      *      *      *

"  *      *      *      *      *      *      *

"261. *Mischievous or Disastrous Consequences Generally.*—If the language is clear, and the intent manifest, there is, of course, no room for presumptions. But if, on the other hand, the language is not clear, and it is obvious that by a particular construction in a doubtful case great public interests would be endangered or sacrificed, the court ought not to presume that such construction was intended by the makers of the law. A statute will not be so construed, as to work public mischief, unless required by clear, unequivocal words, especially if the statute be chiefly to subserve individual interests . . . No statute should be so construed as to protect a fraud, for it is not to be presumed that the legislature so designed it. But even though a particular construction may encourage fraudulent practices, the duty of the court ends in construing the statute in accord with the manifest purpose of the lawmakers."

If there were any doubt as to the meaning of sections 1 and 13, the rules of statutory construction here invoked by petitioners might require consideration of the question as to unreasonableness, absurdity, arbitrariness, inequality, or injustice. They are not applicable because, as we have held,

the language of the law leaves no room for statutory construction. Whether or not the law is unconstitutional because of unreasonable interference with the exercise of the elective franchise is another question. In the absence of a satisfactory showing as to the impairment of any right secured by the Organic Act, this Court has no power to substitute its judgment for that of the Legislature as to what the law ought to be. Hence in our previous opinion after pointing out that petitioners had failed to show that the law was invalid as an unreasonable restriction of the right of suffrage, we definitely disposed of the question which petitioners still insist was not decided when we said that—

" . . . . Viewed from any other standpoint the enactment may or may not be unreasonable, absurd, arbitrary or unjust. It is not within the province of the power of this Court to modify or amend the law by judicial legislation in the guise of statutory construction."

We did not deem it necessary at that time to add that the *Phelps* case has no bearing whatever on the point here presented. So far as that case has any bearing on the question of the reasonableness or unreasonableness of the statutory requirement that a new political party shall have demonstrated its strength at a preceding election before becoming entitled to an observer on the Insular Board of Elections, it tends to sustain the reasonableness of such a requirement.

The eighth ground of the motion is that this Court failed to decide the fundamental question as to whether, under a rational interpretation of the statute, petitioners were entitled to an observer with voice but no vote. This is but a preface to the further statement that it is a well known rule that a court may grant less than is prayed for even in a mandamus proceeding as was done in *Martínez* v. *Saldaña, supra.* Of course, as we have already pointed out, if the Puerto Rican Liberal Party had nominated and voted for a resident commissioner at the preceding election as the Historic Constitu-

tional Party had done in the *Martinez* case, then this Court would have again issued a writ. No part of the relief sought could be granted petitioners because they failed to bring their case within the essential statutory requirement which is not open to interpretation and also failed to show that the said statutory requirement is unconstitutional.

The ninth ground of the motion is that this Court should have decided the constitutional question or should have given the statute a rational interpretation even though the authorities cited by petitioners enunciate only general principles of Constitutional Law and of statutory construction. Here counsel for petitioners invoke section 7 of the Civil Code which provides that "Any court which shall refuse to render a decision on the pretext of silence, obscurity or unintelligibility of the laws, or for any reason, shall be held liable therefor." This Court disposed of the constitutional question, so far as the instant case is concerned, when it said that the law is presumed to be constitutional and that petitioners had failed to overcome that presumption. The rules of statutory construction, to repeat, have no application to a case in which there is no question of statutory construction.

Counsel for petitioners would have no reason to complain if the motion for rehearing had been denied without any statement of the reasons for such denial. The obvious answer to the request for leave to file a brief would be that it has come too late, and to the request for an extension of time within which to offer evidence as to the existence of an electoral pact, that petitioners should have improved the opportunity already given them; nevertheless they will be permitted to file their brief and will be given another opportunity to show, if they can, the existence of an electoral pact.